Slip Op. 17-145

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| WEISHAN HONGDA AQUATIC FOOD CO., LTD., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>CRAWFISH PROCESSORS ALLIANCE,<br><br>Defendant-Intervenor. | Before: Mark A. Barnett, Judge<br><br>Court No. 16-00073 |

**OPINION**

[Sustaining the U.S. Department of Commerce's Final Results, as corrected in the Amended Final Results and as amended by the Remand Results.]

Dated: October 25, 2017

Dharmendra N. Choudhary, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, DC, argued for Plaintiffs. With him on the brief was Francis J. Sailer.

Mollie L. Finnan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Emily R. Beline, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

John C. Steinberger, Adduci, Mastriani & Schaumberg, LLP, of Washington, DC, argued for Defendant-Intervenor. With him on the brief was Will E. Leonard.

Barnett, Judge: This matter is before the court following the U.S. Department of Commerce's ("Commerce" or the "agency") redetermination upon remand in this case. *See* Final Results of Remand Redetermination ("Remand Results"), ECF No. 51-1.

Plaintiffs Weishan Hongda Aquatic Food Co., Ltd ("Weishan"), China Kingdom (Beijing) Import & Export Co., Ltd. ("China Kingdom"), Shanghai Ocean Flavor International Trading Co., Ltd. ("Ocean Flavor"), and Deyan Aquatic Products and Food Co., Ltd. ("Deyan") (collectively, "Plaintiffs") initiated this case challenging Commerce's *Final Results* in the 2013-2014 administrative review ("AR") and new shipper review ("NSR") of the antidumping duty order covering freshwater crawfish tail meat from the People's Republic of China ("PRC" or "China").[1] *See Freshwater Crawfish Tail Meat from the People's Republic of China*, 81 Fed. Reg. 21,840 (Dep't Commerce Apr. 13, 2016) (final results of antidumping duty admin. review and new shipper review; 2013-2014) ("*Final Results*"), PJA Doc. 21, NSR-PR 160, ECF No. 26-6, as corrected in *Freshwater Crawfish Tail Meat from the People's Republic of China*, 81 Fed. Reg. 23,457 (Dep't Commerce Apr. 21, 2016) (notice of correction to final results of antidumping duty admin. and new shipper reviews; 2013-2014) ("*Am. Final Results*"), PJA Doc. 22, NSR-PR 165, ECF No. 26-7, and accompanying Issues and Decision

[1] The administrative review and new shipper review have separate administrative records; each is divided into a public record ("PR")—ECF No. 26-2 (NSR) ("NSR-PR") and ECF No. 26-4 (AR) ("AR-PR")—and a confidential record— ECF No. 26-3 (NRS) and ECF No. 26-5 (AR). Parties submitted a public joint appendix ("PJA") containing all record documents cited in their briefs. Parties did not cite to confidential record documents, *see* PJA, ECF No. 41. Thus, all citations are to the PR and PJA, unless otherwise stated.

Memorandum, A-570-848 (Apr. 8, 2016) ("I&D Mem."), PJA Doc. 17, NSR-PR 151, ECF No. 26-8.

Specifically, Plaintiffs challenge Commerce's rejection of Thai financial statements in favor of a 2014 Annual Report from a South African seafood processor, Oceana Group (the "Oceana Report"), to value factory overhead, selling, general and administrative expenses, and profit (hereinafter referred to as "financial ratios"). Plaintiffs argue that Commerce failed to adequately support or explain its determination that the Oceana Report provided the necessary information to accurately calculate financial ratios or compare the Thai and South African financial statements to determine which was more reliable and representative of Plaintiffs' production experience, and the Thai financial statements are "[v]astly [s]uperior" to the Oceana Report. *See* Pl.'s [sic] Rule 56.2 Mot. for J. on the Agency R. and Br. in Supp. of Pl.'s [sic] Rule 56.2 Mot. for J. on the Agency R. ("Pls.' Mem.") at 14-31, ECF No. 34. Plaintiffs' third basis for challenging Commerce's reliance on the Oceana Report is their disputing of Commerce's finding that South Africa is a significant producer of comparable merchandise. *See id*. at 28-29.

Before oral argument on Plaintiffs' Rule 56.2 motion for judgment on the agency record, Defendant requested that the court remand the determination for Commerce to reconsider its factual basis for finding that South Africa is a significant producer of comparable merchandise, and the court granted the request. *See* Order (March 21, 2017), ECF No. 50. In the Remand Results, Commerce affirmed its conclusion that South Africa is a significant producer of comparable merchandise and, therefore,

continued its reliance on the Oceana Report to value financial ratios. Remand Results at 1-2, 6-11.

Following Commerce's issuance of the Remand Results, Parties filed a joint status report wherein Plaintiffs assert they no longer challenge Commerce's determination that South Africa is a significant producer of comparable merchandise. Post Remand Joint Status Report ("Status Report") at 1, ECF No. 53. Plaintiffs, however, seek completion of the court's review of issues that were not addressed on remand. *Id.* at 2.

For the following reasons, the court sustains the *Final Results*, as corrected by the *Am. Final Results* and as amended by the Remand Results.

## BACKGROUND

In 1997, Commerce issued an antidumping duty order covering freshwater crawfish tail meat from China. *See Freshwater Crawfish Tail Meat From the People's Republic of China*, 62 Fed. Reg. 41,347 (Dep't Commerce Aug. 1, 1997) (notice of final determination of sales at less than fair value) ("*Final LTFV Determination*"), as corrected in *Freshwater Crawfish Tail Meat From the People's Republic of China*, 62 Fed. Reg. 48,218 (Dep't Commerce Sept. 15, 1997) (notice of amendment to final determination of sales at less than fair value and antidumping duty order).[2]

[2] The order covers "freshwater crawfish tail meat, in all its forms . . ., grades, and sizes; whether frozen, fresh, or chilled; and regardless of how it is packed, preserved, or prepared." *Final LTFV Determination*, 62 Fed. Reg. at 41,347. Live crawfish, whole crawfish, and saltwater crawfish are excluded from the scope of the order. *Id.* The freshwater crawfish tail meat covered by the order is classifiable pursuant to the following subheadings of the Harmonized Tariff System of the United States:

On September 2, 2014, Commerce published a notice of opportunity to request an administrative review in this proceeding. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 79 Fed. Reg. 51,958 (Dep't Commerce Sept. 2, 2014). Defendant-Intervenor, Crawfish Processors Alliance ("CPA"), filed requests for review of China Kingdom and Deyan; Ocean Flavor and China Kingdom filed their own requests for review. *See* Request for Admin. Review, PJA Doc. 1, AR-PR 2, ECF No. 41; Freshwater Crawfish Tail Meat from the People's Republic of China: Respondent Selection for the 2013-2014 Antidumping Duty Admin. Review (Dec. 16, 2014), PJA Doc. 3, AR-PR 24, ECF No. 41. In October 2014, Commerce initiated an administrative review for the period of review September 1, 2013 to August 31, 2014. *See Initiation of Antidumping and Countervailing Duty Admin. Reviews*, 79 Fed. Reg. 64,565 (Dep't Commerce Oct. 30, 2014). On November 21, 2014, Commerce aligned the administrative review with the concurrent new shipper review initiated in connection with Weishan. *See* Alignment of New-Shipper Reviews of Freshwater Crawfish Tail Meat from the PRC with the Concurrent Admin. Review of Freshwater Crawfish Tail Meat from the PRC ("Alignment Ltr."), PJA Doc. 2, AR-PR 19, ECF No. 41.

On October 7, 2015 Commerce published its preliminary results. *Freshwater Crawfish Tail Meat From the People's Republic of China*, 80 Fed. Reg. 60,624 (Dep't Commerce Oct. 7, 2015) (prelim. results of antidumping duty admin. review and new

---

1605.40.10.10, 1605.40.10.90, 0306.19.00.10, 0306.29.00.00, and 0306.29.01.00. *Final Results*, 81 Fed. Reg. at 21,841.

shipper reviews; 2013-2014) ("*Prelim. Results*"), PJA Doc. 11, NSR-PR 139, ECF No. 41, and accompanying Preliminary Decision Memorandum, A-570-848 (Oct. 7, 2015) ("Prelim. Decision Mem."), PJA Doc. 7, NSR-PR 123, ECF No. 41. Commerce determined that Thailand, South Africa, Colombia, Bulgaria, Ecuador, and Indonesia were potential surrogate countries based on their economic comparability to the PRC. Freshwater Crawfish Tail Meat from the PRC: Selection of a Surrogate Country ("Surrogate Cntry Mem.") at 2, PJA Doc. 8, NSR-PR 124, ECF No. 41. Upon review of Global Trade Atlas ("GTA") export statistics, Commerce concluded that none of the potential surrogate countries produced freshwater crawfish tail meat or whole crawfish. *Id*. at 4. Therefore, Commerce examined GTA export data for processed seafood, which it had deemed comparable merchandise in prior segments of the proceeding, and determined that Indonesia and Thailand were significant producers of processed seafood. *Id*. Although Commerce had surrogate values for most of the factors of production from both Thailand and Indonesia, Commerce had financial statements solely from Thailand. *Id.* at 5. Thus, Commerce selected Thailand as the primary surrogate country. Prelim. Decision Mem. at 5; Surrogate Cntry Mem. at 5.

During the preliminary investigation, CPA argued that a condition known as "Early Mortality Syndrome" ("EMS") had "decimated" Thai shrimp populations throughout calendar years 2013 and 2014 and, thus, Commerce should reject Thai financial information in favor of the Oceana Report. Preliminary Surrogate Value Memorandum ("Prelim. Surrogate Value Mem.") at 2, PJA Doc. 9, NSR-PR 125, ECF No. 41; Pet'r Surrogate Value Cmts., Ex. 5 (the "Oceana Report"), PJA Doc. 6, NSR-PR

66, ECF No. 41. Finding the more contemporaneous Thai financials unusable due to the effects of EMS on Thai seafood processors from 2013 to 2014, in its Preliminary Results, Commerce relied on 2012 financial statements from two Thai seafood processors, Surapon Food Public Company Ltd. ("Surapon") and Kiang Huat Sea Gull Trading Frozen Food Public Company Ltd. ("King Huat"). Prelim. Surrogate Value Mem. at 6; Prelim. Decision Mem. at 15; *see also* I&D Mem. at 3 (identifying the Thai seafood processors). Commerce preliminarily calculated dumping margins of zero percent for each plaintiff. *Prelim. Results*, 80 Fed. Reg. at 60,625.

In its case brief filed in the administrative and new shipper reviews, CPA argued that Commerce should not use the 2012 financial statements of Surapon and Kiang Huat because EMS had begun impacting Thai shrimp populations in 2012, not 2013, and the statements show that the companies had received countervailable export subsidies. CPA Case Br. and Request for Hr'g ("CPA Case Br.") at 1-7, PJA Docs. 4, 12, AR-PR 99, NSR-PR 140, ECF No. 41; I&D Mem. at 3-4.[3] CPA urged Commerce to use the Oceana Report on the basis that South Africa is a significant producer of comparable merchandise, and the annual report is contemporaneous with the period of review. CPA Case Br. at 7-9; I&D Mem. at 4-5.

In the new shipper review, Weishan countered that Surapon's and Kiang Huat's respective financial performances were unaffected by EMS in 2012, and the statements

---

[3] CPA pointed to "promotional privileges" in Surapon's and Kiang Huat's financial statements as evidence that both companies benefitted from the Thai government's "Industrial Investment Promotion Act B.E. 2520." CPA Case Br. at 6 (citing Prelim. Surrogate Value Mem., Attach. 7, PJA Doc. 10, NSR-PR 125-128, ECF No. 41).

"are only slightly non-contemporaneous." Weishan Rebuttal Br. at 4-5, 6, PJA Doc. 14, NSR-PR 141, ECF No. 41; I&D Mem. at 5-6. Weishan also argued that Commerce should not reject the subsidy-tainted Thai financial statements because the Oceana Report is "simply unusable" and thus does not afford Commerce with a "superior choice." Weishan Rebuttal Br. at 6. Specifically, Weishan argued that South Africa is not a significant producer of comparable merchandise, and the Oceana Report is insufficiently disaggregated because it contains a basket line item for "Cost of Sales" and fails to separate expenses for raw materials and labor. *Id.* at 7-12.

Commerce rejected CPA's argument regarding EMS but credited its argument that the Thai financial statements were unusable due to the companies' receipt of countervailable export subsidies, and that it should instead select the Oceana Report. I&D Mem. at 8-9. Thus, in the *Final Results*, although Commerce again selected Thailand as the primary surrogate country, *id*. at 2, it relied on the Oceana Report to value financial ratios, *id*. at 9.

Commerce noted that South Africa is economically comparable to China, and the Oceana Report is contemporaneous with the period of review. *Id*. Commerce further explained that South Africa is a significant producer of comparable merchandise because "export revenues for processed seafood listed as 'canned fished and fishmeal and horse mackerel and hake' outlined in [Oceana's 2014 Annual Report] are 4,289,946,000 Rand in the year ending September 30, 2014," *id*. at 9 & n. 27 (citing the Oceana Report at 21), and Commerce previously determined that processed seafood constitutes comparable merchandise, *id*. at 9 & n.28 (citing Surrogate Cntry Mem.).

In response to Weishan's argument that the Oceana Report failed to disaggregate raw material and labor costs, Commerce asserted, "we find that it contains the necessary information for [Commerce] to calculate appropriate financial ratios." *Id*. at 9 (citing Freshwater Crawfish Tail Meat from the PRC: Final Results Surrogate-Value Mem. ("Final Surrogate Value Mem."), PJA Doc. 18, NSR-PR 152, ECF No. 41). In the Final Surrogate Value Memorandum, Commerce explained that it generally calculates the overhead ratio by dividing total overhead costs by the total costs of materials, labor, and energy. Final Surrogate Value Mem. at 2. However, in the *Preliminary Results*, it had been unable to segregate energy costs from overhead costs, and, therefore, "applied [the] overhead ratio, which included energy costs, to the per-unit costs for materials and labor only[,] and did not calculate a separate per-unit cost for energy." *Id*.[4] For the *Final Results*, reliance on the Oceana Report enabled Commerce to follow its normal methodology. *Id*. That is, energy costs were included in the denominator along with materials and labor, rather than the numerator. *Id*. Commerce calculated final weighted average dumping margins of 22.16 percent for China Kingdom, 12.04 percent for Deyan, 17.23 percent for Ocean Flavor, and 26.10 percent for Weishan. *Final Results*, 81 Fed. Reg. at 21,841.

[4] In the preliminary proceedings, Commerce explained that because the 2012 Thai financial statements did not separately identify energy expenses, it had been unable to "exclude energy costs from the calculation of the surrogate financial ratio for overhead." Prelim. Surrogate Value Mem. at 6. According to its past practice, therefore, Commerce "disregard[ed] the respondents' energy inputs in the calculation of normal value in order to avoid double-counting energy costs which have necessarily been captured in the surrogate financial ratios." *Id.*

On October 7, 2016, Plaintiffs filed a Rule 56.2 motion for judgment on the agency record. *See generally* Pls.' Mem. Defendant and Defendant-Intervenor opposed the motion. *See generally* Def.'s Mem. in Opp'n to Pls.' Rule 56.2 Mot. for J. on the Agency R. ("Def.'s Resp."), ECF No. 35; Br. of the Def.-Int., Crawfish Processors Alliance, in Opp'n to Pls.' Mot. for J. on the Agency R. ("CPA Resp."), ECF No. 36. In addition to opposing the substance of Plaintiffs' motion, CPA argued that the Plaintiffs from the administrative review (China Kingdom, Deyan, and Ocean Flavor) failed to exhaust their administrative remedies because none of them had filed case or rebuttal briefs with Commerce in advance of the *Final Results*. CPA Resp. at 4-6.

On March 16, 2017, the court issued five questions to Parties prior to oral argument on the pending Rule 56.2 motion. *See* Letter to Counsel (March 16, 2017), ECF No. 46. Defendant subsequently requested remand to address issues the court raised in its third question, which related to the factual basis for Commerce's determination that South Africa is a significant producer of comparable merchandise. *See* Def.'s Mot. for a Voluntary Remand ("Def.'s Remand Mot.") at 3, ECF No. 47.

On June 5, 2017, Commerce filed its Remand Results affirming its conclusion that South Africa is a significant producer of comparable merchandise and, therefore, its reliance on the Oceana Report to value financial ratios. *See* Remand Results at 1-2, 6-11. In a Post Remand Joint Status Report, Plaintiffs asserted that they no longer challenge Commerce's finding that South Africa is a significant producer of comparable

merchandise,[5] but continued to challenge Commerce's reliance on the Oceana Report to value financial ratios. *See* Status Report at 1-2. Plaintiffs requested oral argument on that issue, but no further briefing. *Id.* at 2. Defendant agreed that no further briefing was merited, and deferred to the court as to scheduling oral argument. *Id.* at 3. Defendant-Intervenor sought briefing on whether Plaintiffs were foreclosed from challenging Commerce's use of the Oceana Report for failure to comment on the draft redetermination. *Id.* at 3-4.

The court granted Plaintiffs' request for oral argument. *See* Order (July 26, 2017), ECF No. 54. In the Order, the court invited Parties to explain their respective positions on the issue of administrative exhaustion during the remand proceeding, but did not permit briefing on that issue. *Id.* The court heard oral argument on September 20, 2017. *See* Docket Entry, ECF No. 57.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[6] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp. (30) v. United States*,

[5] Accordingly, the court will not further address this issue.
[6] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and all citations to the U.S. Code and Code of Federal Regulations are to the 2012 edition unless otherwise stated.

322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB.*, 305 U.S. 197, 229 (1938)). It "requires more than a mere scintilla," but "less than the weight of the evidence." *Nucor Corp. v. United States*, 34 CIT 70, 72, 675 F. Supp. 2d 1340, 1345 (2010) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)). In determining whether substantial evidence supports Commerce's determination, the court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). However, that a plaintiff can point to evidence that detracts from the agency's conclusion or the possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence. *Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984) (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966)). The court may not "reweigh the evidence or . . . reconsider questions of fact anew." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015) (quoting *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992)); *see also Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (citation omitted) (the court "may not reweigh the evidence or substitute its own judgment for that of the agency").

## DISCUSSION

### I. Legal Framework for Selecting Surrogate Financial Values

When an antidumping duty proceeding involves a nonmarket economy country, Commerce determines normal value by valuing the factors of production in a surrogate country, *see* 19 U.S.C. § 1677b(c)(1), and those values are referred to as "surrogate values." In selecting surrogate values, Commerce must use "the best available information" that is, "to the extent possible," from a market economy country or countries that are economically comparable to the nonmarket economy country and "significant producers of comparable merchandise." *Id.* § 1677b(c)(4).

Commerce has a regulatory preference for valuing financial ratios from a primary surrogate country based on the data's "specificity, contemporaneity, and quality." I&D Mem. at 8; *see also* 19 CFR § 351.408(c)(2), (4). However, Commerce may resort to a secondary surrogate country when data from the primary surrogate country does not provide a viable option for valuing a factor of production. I&D Mem. at 9 & n. 29 (citing *FMC Corp. v. United States*, 27 CIT 240, 251 (2003)). "When examining the merits of financial statements on the record," Commerce "weigh[s the] available information" before deciding what constitutes the "best available information." *Id*. at 8.

Commerce generally rejects financial statements that reflect evidence of countervailable subsidies when it has "other, more reliable and representative data on the record." *Id*. at 8 (citation omitted); *see also* 19 U.S.C. § 1677b(c)(5)(2015) (affording Commerce discretion to reject surrogate values "without further investigation if [it] has

determined that broadly available export subsidies existed or particular instances of subsidization occurred with respect to those [surrogate values]").[7]

## II. Plaintiffs Failed to Exhaust Certain Arguments in the Underlying Administrative Proceeding

Plaintiffs raise several objections to Commerce's reliance on the Oceana Report to value financial ratios, some of which were not made to Commerce during the administrative proceeding. "[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). The statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citation omitted). Administrative exhaustion generally requires a party to present *all* arguments in its administrative case and rebuttal briefs before raising those issues before this court. *Dorbest Ltd v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010); *see also Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (failure to raise a specific argument before Commerce precluded judicial review even if, as plaintiff contended, the argument was "simply another angle to an *issue* which it did raise before

---

[7] Section 1677b(c)(5) came into effect during the pendency of the underlying administrative proceeding. *See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015*, 80 Fed. Reg. 46,793, 46,795 (Dep't Commerce Aug. 6, 2015) (clarifying that § 1677b(c)(5) applies "to determinations made on or after August 6, 2015"). The codification of Commerce's discretion to reject subsidy-tainted financial statements is not determinative, however. The provision simply "clarifies [Commerce's] authority for its existing practice, and does not impose any new requirements on the parties to [antidumping] proceedings." *Id.*

the [agency]”); *Paul Muller Industrie GmbH & Co. v. United States*, 31 CIT 1084, 1088, 502 F. Supp. 2d 1271, 1275 (2007) (plaintiff failed to exhaust issues concerning freight, duties, and brokerage fees when it merely “raised general issues regarding inventory carrying costs” in the underlying proceeding). This “allow[s] the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review—advancing the twin purposes of protecting administrative agency authority and promoting judicial efficiency.” *Vinh Hoan Corp. v. United States*, 40 CIT ___, ___, 179 F. Supp. 3d 1208, 1226 (2016) (citation omitted).

With regard to Commerce’s methodology, Plaintiffs here contend that Commerce failed to adequately compare the Thai and South African statements, in contravention of Commerce’s policy and judicial precedent. *See* Pls.’ Mem. at 20-23 (citing *Juancheng Kangtai Chemical Co., Ltd. v. United States*, Slip Op. 15-93, 2015 WL 4999476 (2015), and *CP Kelco US, Inc. v. United States*, Slip Op. 16-36, 2016 WL 1403657 (2016)). Plaintiffs further contend that Commerce failed to adequately explain how the Oceana Report provided the requisite information to value financial ratios in light of its insufficient disaggregation and lack of a specific line item for raw materials. *See id*. at 14-16; Pls.’ Reply Br. (“Pls.’ Reply”) at 2-3, ECF No. 37.

In addition to these general arguments, Plaintiffs now specifically point to Commerce’s allocation of “manufacturing overhead” to selling, general and administrative expenses, and surmise that manufacturing overhead may have been

double-counted under “cost of sales.” Pls.’ Mem. at 18; Pls.’ Reply at 8-9.[8] Plaintiffs further contend that the amount for raw materials and energy includes an amount for the cost of goods purchased for trading that is not accounted for in the amount reflected by the change in finished goods. Pls.’ Reply at 4-7. Finally, Plaintiffs contend that the Oceana Report does not reflect production or business processes that are comparable to Chinese crawfish manufacturers. *Id.* at 10-14. According to Plaintiffs, Oceana Group is a large multinational company that engages in disparate yet integrated activities. *Id.* at 12 (disparate activities include producing goods and investing; indications of vertical integration include fishing, processing, and cold storage).

In briefing to Commerce, Weishan disputed the propriety of replacing the Thai financial statements Commerce had relied on in the *Preliminary Results* with financial ratios derived from the Oceana Report. *See* Weishan Rebuttal Br. at 1-12. Regarding the applicable legal framework, Weishan argued that Commerce must “compare the different sources of data available on the record and select the best source among the options based on the quality, specificity and contemporaneity of the data.” *Id*. at 2. However, the only specific problems Weishan identified with respect to the Oceana

[8] Plaintiffs contend that Defendant “concedes” that the Oceana Report is distorted from insufficient disaggregation and allocation of overhead expenditure to selling, general and administrative expenses. Pls.’ Reply at 9 (citing Def.’s Resp. at 17). On page 17 of its response, Defendant restated Plaintiffs’ arguments about disaggregation and allocation of overhead expenditure, and noted that, in the *Preliminary Results*, Commerce had relied on Thai financial statements that did not segregate energy costs. Def.’s Resp. at 17. The court does not construe Defendant’s failure to address directly Plaintiffs’ arguments about the allocation of overhead in the Oceana Report as an implied concession as to the merits of those arguments.

Report were that it contained a basket category for "cost of sales" and was insufficiently disaggregated because it lacked specific line items for labor and raw materials. *See* Weishal Rebuttal Br. at 9.[9] Accordingly, those are the only objections Commerce had notice of and an opportunity to address. *See Trust Chem Co. Ltd. v. United States*, 35 CIT ___, ___, 791 F. Supp. 2d 1257, 1268 n.27 (2011) (the "determinative question" is whether Commerce had notice of the disputed issue).

Weishan did not present to Commerce in the first instance its arguments about possible misallocation of overhead expenditure, inflation of the amount for raw materials by some unspecified amount for the cost of goods purchased for trading, or the incomparability of Oceana Group's business and production experiences. *See* Weishan Rebuttal Br. at 9-10. Weishan certainly had notice that Commerce might rely on the Oceana Report because petitioners had suggested it do so in their case brief. *See* CPA Case Br. at 7-11. While Weishan sought to rebut CPA's arguments, it did not take that opportunity to raise all the arguments they now raise to the court. *See* Weishan Rebuttal Br. at 9-10.

In an analogous case, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") recently rejected appellants' attempt to raise arguments that had not been exhausted before the agency. *See Boomerang Tube*, 856 F.3d 908. The issue in that case was the amount to be used for constructed value profit. *Id*. at 910-912. Both

---

[9] Weishan had also argued that South Africa is not a significant producer of comparable merchandise. In light of the Remand Results, that issue is now moot. *See* Status Report at 1-2.

Boomerang Tube LLC ("Boomerang") (the petitioner) and Jubail Energy Services Company ("JESCO") (the respondent) argued to the agency in their case briefs for alternatives to the constructed value profit used in the preliminary determination. *Id*. at 910-11. In its rebuttal brief, Boomerang raised only one objection to an alternative data source proposed by JESCO and accepted by Commerce in its final determination. *Id*. at 911. The Federal Circuit held that it was an abuse of discretion for the Court of International Trade to have allowed Boomerang to raise additional arguments against the particular data source proposed by JESCO without first having exhausted them before the agency. *Id*. at 912-13.

Likewise, as discussed above, Plaintiffs here chose to exhaust some, but not all, of their arguments against using the data in the Oceana Report during the administrative proceeding. There are, of course, exceptions to the requirement of exhaustion, which may be applied at the court's discretion. Previously enumerated exceptions include futility, an intervening court decision such that the new interpretation would impact the agency's actions, pure questions of law, or when plaintiff had no reason to believe the agency would not follow established precedent. *See Luoyang Bearing Factory v. United States*, 26 CIT 1156, 1186, n.26, 240 F. Supp. 2d 1268, 1297 n.26 (2002) (collecting cases). The court has also found exceptions to exhaustion when a private party is denied access to critical information at a time when its case brief is due or when requiring exhaustion is burdensome such that it would result in "undue prejudice to subsequent assertion of a court action." *See Corus Staal BV v. United*

*States*, 502 F.3d 1370, 1381 (Fed. Cir. 2007) (citation omitted). However, none of these exceptions apply here.[10]

Additionally, to the extent that Plaintiffs' argument about the cost of goods purchased for trading is related to its concern with Commerce's inability to disaggregate labor and raw materials, "[b]oth the Federal Circuit and this court have held that failure to raise a specific argument in a case brief, even if the general issue is addressed, constitutes a failure to exhaust administrative remedies." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 CIT 533, 545, 616 F. Supp. 2d 1354, 1366 (2009) (citing *Rhone Poulenc*, 899 F.2d at 1191) (declining to consider the merits of an argument characterized by plaintiff as "merely a greater explication of the same issue raised in [its] Administrative case brief below"); *see also Paul Muller*, 31 CIT at 1088, 502 F. Supp. 2d at 1275. Failing to raise this specific argument deprived Commerce of the opportunity to be "the initial decisionmaker" regarding Weishan's assertion that a question about the cost of goods purchased for trading calls into question whether the Oceana Report constitutes the best available information for valuing surrogate financial

[10] The agency's decision must be based on substantial evidence, 19 U.S.C. § 1516a(b)(1)(B)(i), and be sufficiently well explained such that the path of its reasoning is discernible to the reviewing court, *NMB Singapore Ltd. v. United States,* 557 F.3d 1316, 1319 (Fed. Cir. 2009). Bearing in mind, however, that the statute requires parties to exhaust their arguments before the agency, 28 U.S.C. § 2637(d), it would be inappropriate, if not unjust, for the court to expect the agency to anticipate and address arguments against the selection of a particular data point that were never presented to the agency in the first instance, particularly when the party had the information, opportunity, and incentive to have presented those arguments. *See Rhone Poulenc*, 899 F.2d at1191 (superseded by statute in other respects); *Boomerang Tube*, 856 F.3d 908.

ratios. *See Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013) (citing *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)); *Vinh Hoan*, 179 F. Supp. 3d at 1226 (exhaustion enables the agency "to apply its expertise . . . and compile a record adequate for judicial review") (citation omitted).

Separately, CPA argues that the court should sustain the *Final Results* with regard to the administrative review and dissolve the preliminary injunction against liquidation of entries subject thereto because the administrative review Plaintiffs failed to exhaust administrative remedies by declining to file case or rebuttal briefs in that segment of the proceeding. CPA Resp. at 4-6.

CPA is correct that the administrative and new shipper reviews represent different segments of the proceeding, and although Commerce aligned the schedules of the two reviews, it maintained separate administrative records. *See* CPA Resp. at 4 (citing *Cerro Flow Prods., LLC v. United States*, 38 CIT ___, ___, 2014 WL 3539386 (2014)); Alignment Ltr. CPA is also correct that Weishan filed its Rebuttal Brief protesting reliance on the Oceana Report solely in the new shipper review. *See* CPA Resp. at 2; Weishan Rebuttal Br., Cover Ltr. at 1 (submitting the brief in reference to the new shipper review). At oral argument, the Government clarified that it was not asserting the doctrine of administrative exhaustion against the administrative review Plaintiffs because Commerce had examined surrogate values jointly for both reviews, relying on the same evidence and arriving at the same determination.

This appears to be first time the court has been asked to address the doctrine of administrative exhaustion in the context of separate, but aligned, segments of a

proceeding, in relation to arguments raised on the record of one segment and not the other, but jointly examined by Commerce. In light of the decision on the merits of this case, the court need not resolve CPA's argument. That being said, in fairness to all parties, going forward, Commerce would be well-advised to clarify the implications of aligning two segments of the same proceeding. Commerce could combine the records of the two segments, or notify parties that arguments raised in one segment may only be addressed in that segment. The court should not have to discern the implications of Commerce's treatment of parties' evidence and arguments in aligned proceedings *post hoc*. The court now turns to the merits of Plaintiffs' exhausted arguments.[11]

### III. Commerce's Decision to Rely on the Oceana Report to Value Financial Ratios was Supported by Substantial Evidence

As discussed above, Plaintiffs contend that Commerce failed to adequately explain its selection of the Oceana Report in light of its degree of aggregation, and failed to compare properly the Oceana Report to the Thai financial statements. Pls.' Mem. at 14-18, 20-22; Pls.' Reply at 2-3.[12] In their respective briefs, the Government

---

[11] CPA also contends that none of the Plaintiffs may continue to challenge Commerce's reliance on the Oceana Report because they did not comment on the draft remand redetermination. Status Report at 3. CPA did not, however, pursue the opportunity to explain its contention at oral argument. The court declines to require re-exhaustion of previously raised arguments. Commerce's inquiry on remand was limited to its finding that South Africa is a significant producer of comparable merchandise. *See* Remand Results at 5, 6; Def.'s Remand Mot. at 3. Requiring Plaintiffs to submit to the agency arguments that had separately been raised to the court and were not expressly covered by the terms of the court's remand order would serve no practical purpose. In the absence of any indication that the agency would reconsider these issues on remand, the court declines to require any further exhaustion.

[12] Plaintiffs' brief also contains a subsection titled, "[t]he two Thai financial statements are vastly superior to the Oceana [Report] on a comparative totality of circumstances analysis." Pls.' Mem. at 23 (capitalization omitted). Therein, Plaintiffs argue that the

and CPA emphasize Commerce's ability to reject financial statements that reflect evidence of countervailable subsidies. *See* Gov. Resp. at 11-13; CPA Resp. at 7-8. The Government cites, in part, legislative history directing Commerce to avoid using prices it suspects may be subsidized and Federal Circuit case law sustaining Commerce's rejection of subsidized prices to value certain inputs. *See* Gov. Resp. at 11 (citing H.R. Rep. No. 100-576, at 590 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 1547, 1623); *id.* at 13 (citing *CS Wind Vietnam Co., Ltd. v. United States*, 832 F.3d

---

Thai statements are superior to the Oceana Report because subsidy-distortion is a "lesser infirmity" than the defects in the Oceana Report, there are two Thai statements as opposed to one South African statement, Thailand is the primary surrogate country, Commerce has previously relied on the Thai statements, thus, predictability considerations favor their continued use, South Africa is not *as* significant a producer of comparable merchandise as is Thailand, and the Thai statements' slight non-contemporaneity is not relevant. *See id*. at 23-29. In essence, Plaintiffs conduct the comparative analysis it asserts Commerce should have undertaken. *See id*. at 30-31.

Plaintiffs' arguments reflect a misunderstanding of the applicable standard of review. Plaintiffs' arguments are premised, in part, on the contention that Commerce's selection of the Oceana Report "is contradicted by substantial evidence." *Id*. at 10 (so titling the heading under which the above-noted subsection is contained). That is not the court's inquiry. Rather, the court must ascertain whether Commerce's determination is supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i). In making that determination, the court considers evidence that "detracts from the substantiality of the evidence." *Nippon Steel Corp.*, 337 F.3d at 1379. But even if substantial evidence detracted from the agency's determination, the determination is not necessarily unsupported by substantial evidence. In other words, substantiality does not require a "majority" of the evidence. *See Nucor Corp.*, 34 CIT at 72, 675 F. Supp. 2d at 1345 (substantial evidence requires "more than a mere scintilla," but "less than the weight of the evidence"). Moreover, it is not the role of the court to reweigh the evidence put before Commerce. *Downhole Pipe,* 776 F. 3d at 1377. If the evidence upon which the agency relies is such that "a reasonable mind might accept as adequate to support" its conclusion, *Huaiyin Foreign Trade Corp. (30),* 322 F. 3d at 1374, then, in keeping with the court's standard of review, the court must affirm.

1367, 1374-75 (Fed. Cir. 2016)).[13] CPA relies on 19 U.S.C. § 1677b(c)(5) and argues that Plaintiffs' "entire brief is an argument for 'further investigation' of the subsidy-tainted Thai financial statements." CPA Resp. at 7. At oral argument, the Government pointed to the Final Surrogate Value Memorandum and record evidence cited therein as evidence of Commerce's weighing of the two sources of surrogate financial values.

The court will uphold Commerce's determination when the path to that determination is reasonably discernable from the determination itself. *See NMB Singapore Ltd.*, 557 F.3d at 1319 ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.") (internal citations omitted). Commerce's reasoning adequately apprises the court of the path to its decision. Moreover, Commerce sufficiently compared the available financial statements in light of the arguments Weishan raised to the agency.

In the Issues and Decision Memorandum, Commerce explained that the 2012 financial statements of Thai companies Surapon and Kiang Huat demonstrated that they benefitted from countervailable subsidies. *See* I&D Mem. at 8. Commerce went on to find that South Africa met the statutory requirements of being economically comparable to the PRC and a significant producer of comparable merchandise, and that the Oceana Report was contemporaneous with the period of review. *See id*. at 9; *see*

---

[13] In *CS Wind*, the Federal Circuit affirmed Commerce's decision to rely on surrogate values instead of Korean market prices to value certain inputs purchased in Korea and exported to Vietnam based on a reasonable suspicion that export subsidies existed with respect to those components. 832 F.3d at 1374-75.

*also* Remand Results at 11 (affirming that South Africa is a significant producer of comparable merchandise). In response to Weishan's concerns about the inability to disaggregate labor and raw material costs, Commerce asserted, in an admittedly conclusory fashion, that "we find that [the Oceana Report] contains the necessary information for [Commerce] to calculate appropriate financial ratios." I&D Mem. at 9. Commerce's cursory narrative response to Weishan's argument is not, however, fatal. In that response, Commerce also cited to its discussion in the Final Surrogate Value Memorandum. *See id.* at 9 & n. 30.

In the Final Surrogate Value Memorandum, Commerce explained that it usually calculates the overhead ratio by dividing total overhead costs by the total costs of materials, labor, and energy. *See* Final Surrogate Value Mem. at 2. In the *Preliminary Results*, however, Commerce had been unable to apply this methodology because the Thai financial statements did not segregate energy costs from total overhead costs. *See id.* Accordingly, "in the *Preliminary Results*, [Commerce] applied [its] overhead ratio, which included energy costs, to the per-unit costs for materials and labor only[,] and did not calculate a separate per-unit cost for energy." *Id.* In contrast, for the *Final Results*, reliance on the Oceana Report allowed Commerce to apply its usual methodology because it could determine the material, labor, and energy costs to include in the denominator of the overhead ratio as opposed to having some component, such as energy costs, included in the numerator. *Id.* Commerce cited the "surrogate value spreadsheets attached to the company-specific analysis memoranda" as evidence of its financial ratio calculations. *Id.*

Therein, it is evident that although Commerce began with the aggregated cost of sales, it was able to segregate amounts for materials, labor, and energy to serve as the denominator for the overhead ratio calculation. *See* Weishan Final Results Analysis Mem., Attach. 7B ("Financial Ratios Spreadsheet"), PJA Doc. 19, NSR-PR 155, ECF No. 41. From the cost of sales, Commerce deducted amounts for depreciation, amortization, and operating lease expenses (reflecting manufacturing overhead costs used in the numerator of the ratio); employment and retirement costs and share-based payments (reflecting labor costs to include in the denominator of the ratio); and changes to traded or finished goods. *See id.* Commerce used the resulting figure as the amount for raw materials. *See id.* While Commerce did not separately identify energy costs, it considered energy as included with the cost of raw materials in the denominator, as is its usual practice. *See id.* (combining the sum of materials and labor to determine the amount for material, labor, and energy costs to use in the denominator).[14]

Thus, Commerce addressed Weishan's concerns with regard to the basket category for cost of sales and the aggregation of labor and raw materials therein in its discussion of its ability to use its preferred methodology in the *Final Results*. *See* Final Surrogate Value Mem. at 2. Reading the Issues and Decision Memorandum together with the Final Surrogate Value Memorandum, Commerce compared the Thai and South African statements and determined that the taint of countervailable subsidies in

[14] Plaintiffs argue that the denominator in the overhead ratio includes overhead that Commerce had been unable to subtract from the total cost of sales. Pls.' Mem. at 16. Commerce's accounting shows this not to be the case. *See* Financial Ratios Spreadsheet; *see also* CPA Resp. at 8-9 (responding the Plaintiffs' argument).

conjunction with the disaggregation issues in the Thai statements outweighed any perceived flaws in the Oceana Report. *See* I&D Mem. at 8-9; Final Surrogate Value Mem. at 2. In particular, Commerce found that it was able to address the only identified weakness (the aggregation issue) within its calculation methodology and based on the information contained in the Oceana Report. The Financial Ratios Spreadsheet itself provides substantial support for Commerce's determination. *See* Financial Ratios Spreadsheet. Commerce cannot be faulted for failing otherwise to address alleged deficiencies that Weishan failed to raise to the agency. Moreover, the cases relied on by Plaintiffs do not require a different outcome. *See* Pls.' Mem. at 20-23 (citing *Juancheng*, 2015 WL 4999476, *CP Kelco*, 2016 WL 1403657).

In *Juancheng*, Commerce relied on Philippine financial statements from a company the plaintiff contended had received countervailable subsidies, and rejected Thai financial statements it had deemed insufficiently detailed. 2015 WL 4999476 at *12. The court explained that "[t]he decision on whether to rely on a particular financial statement (even one tainted, *arguendo,* by subsidies) is record-dependent, . . . and it is not for the court to choose between arguably untainted but incomplete data and arguably complete but tainted data, as that is Commerce's province." *Id.* at *13 (internal citations omitted). *Juancheng*, therefore, stands for the proposition that Commerce's selection of financial statements is "record-dependent" and, thus, not subject to *per se* rules of exclusion. *Id.* So too here, Commerce's selection of the Oceana Report depended upon its finding that material, labor, and energy costs were sufficiently

identified for it to apply its preferred methodology for calculating the overhead ratio. *See* Final Surrogate Value Mem. at 2; I&D Mem. at 9.

In *CP Kelco*, Commerce had selected subsidy-tainted Thai financial statements over incomplete Thai financial statements to value financial ratios. 2016 WL 1403657 at *2. The court had remanded for Commerce to further explain why the subsidy-tainted statements were better than the incomplete statements. *Id.* ("Commerce should have compared the two side-by-side.") (internal quotation marks and citation omitted). Following remand, the court again found that Commerce had insufficiently compared the statements' relative strengths and weaknesses. *Id.* at *5. In contrast, here, Commerce addressed the weaknesses Weishan had identified in the Oceana Report, and found, based on Commerce's ability to allocate certain figures to the numerator or denominator of the overhead ratio calculation, that the weaknesses were non-existent. *See* Final Surrogate Value Mem. at 2; I&D Mem. at 9. A fuller elaboration is not required. *See NMB Singapore Ltd.,* 557 F.3d at 1319 ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.") (internal citations omitted).

## CONCLUSION

In accordance with the foregoing, the court sustains Commerce's *Final Results*, as corrected by the *Am. Final Results* and as amended by the Remand Results. Judgment will be entered accordingly.

/s/ Mark A. Barnett
Mark A. Barnett, Judge

Dated: October 25, 2017
New York, New York